Harry C. Weeks v. Commissioner. Ethel Gill Weeks v. Commissioner.
Weeks v. Commissioner
Docket Nos. 105363, 105364.
United States Tax Court
1942 Tax Ct. Memo LEXIS 82; 1 T.C.M. (CCH) 151; T.C.M. (RIA) 42622; November 24, 1942
*82 R. B. Cannon, Esq., 911 Sinclair Bldg., Fort Worth, Tex., for the petitioners. Donald P. Moyers, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, J.: These consolidated proceedings each are brought for a redetermination of deficiencies in income tax for the years 1936 and 1937 in the amounts of $544.39 and $1,407.49, respectively. The issues are (1) whether petitioners sustained a deductible loss on the dissolution of a law partnership, petitioner Harry C. Weeks having paid $25,000 to enter its predecessor; (2) whether such loss, if any, occurred on the dissolution, or the year of final settlement of partnership affairs; and (3) whether stock of a realty company held by petitioner became worthless in 1937. Findings of Fact Petitioners are husband and wife and reside in Fort Worth, Texas. They filed their individual tax returns for the taxable years in question with the collector of internal revenue for the second district of Texas at Dallas on the community property basis. Petitioner Harry C. Weeks, hereinafter referred to as petitioner, is engaged in the practice of law. An older brother, W. F. Weeks, had entered practice in 1909 in Wichita Falls, *83 Texas, upon his graduation from law school. Prior to January 1, 1923, petitioner and one Charles I. Francis were working in W. F. Weeks' office as employees. As of January 1, 1923, a partnership between W. F. Weeks, petitioner and Francis was formed to take over the law practice of W. F. Weeks. Petitioner and Francis each purchased a one-fourth interest in the practice and in the law library and office equipment for $25,000. The practice taken over consisted of cases in process, uncollected fees, and business in general. All receipts after January 1, 1923, were accounted for as income regardless of the fact that they might be payment for services that had been performed in whole or in part prior to the formation of the partnership. The depreciated cost of the library, furniture and fixtures as of January 1, 1923, was $64,850, one-fourth of which, $16,212.50, was deducted from the $25,000 payment to arrive at the amount deducted by petitioner as a loss, $8,787.50. In opening and keeping the books of the partnership between petitioner, his brother and Francis, the library and physical equipment were set up at their depreciated cost to W. F. Weeks. The difference between that depreciated *84 cost and the amounts paid to W. F. Weeks by petitioner and Francis was never reflected on the partnership books because the payments were made directly to W. F. Weeks. Neither petitioner nor the partnership deducted anything from the fees collected after January 1, 1923, as representing any part of the $8,787.50 paid by petitioner in excess of the cost of the physical property. The names of Tarlton Morrow and a Mr. Hankerson were sometimes included as a part of the firm name but they were not then partners. In 1931, which was about the time the East Texas Oil Field opened, the partnership opened a branch office in East Texas and W. F. Weeks moved down there. That office was maintained as a branch office for only a few months and in 1931 or 1932 W. F. Weeks withdrew from the firm and took over such business as there was in East Texas. Petitioner and Francis, together with others who had been associated with them in Wichita Falls, continued the practice of law there. W. F. Weeks took with him his half of the partnership's physical equipment. Petitioner and Francis continued in practice without further interruptions until 1934 when Francis moved to Houston and entered a law firm there. *85 At this time there was a good deal of work on hand and petitioner and Francis agreed, substantially, that what petitioner did thereafter belonged to a new partnership which petitioner formed with Tarlton Morrow; that what Francis did in Houston was his; that petitioner, Francis and Morrow would continue to wind up business which was on hand and make a division of receipts in accordance with what the equities might be, based on the time devoted to the matters. The work on the last cases in which petitioner and Francis had been jointly employed was completed in 1936, in which year the fees were fully ascertained. Substantial collections were made in 1937 on account of such work, one client paying $38,000 or $39,000 in 1937 for business terminated in 1936. Early in 1937 the Francis partnership had no accounts left on its books uncollected or business unfinished, when it was terminated. In May of 1937 petitioner felt his practice would be best served by moving to Forth Worth. He did this and bought a home there in the fall of 1937. In 1926 petitioner and W. F. Weeks were each the owners of a one-half undivided interest in approximately 200 acres of land adjacent to the City of Wichita *86 Falls, Texas. Petitioner's interest in this land had cost him $17,352.50. Park Place Realty Company was organized in 1926 as a Texas corporation with 1,000 shares of capital stock of no par value. All of its outstanding stock except for a qualifying share was owned by petitioner and W. F. Weeks and was issued to them solely in exchange for the transfer to the corporation of the 200 acres of land. The Realty Company was organized to promote the real estate development of the tract. At the time of its organization the land was partially improved. Weeks and his brother had given an adjacent tract to the City of Wichita Falls as a municipal park on condition that the city would build a street between the park and the development. When the transfer was made to the Realty Company work on the street was inprogress. Some grading and street work was done and some utilities were installed. The tract of land is adjacent to the City of Wichita Falls and is about the only wooded section in the locality. This tract and the municipal park had about the best growth of timber in a region where natural trees are scarce. The land was adjacent also to the Wichita Falls Golf and Country Club, which *87 was the only real country club in the vicinity, and to property which W. F. Weeks had sold shortly before to developers of an extensive subdivision known as Country Club Estates which became then and is still the best residential section in Wichita Falls. The developers of Country Club Estates paid W. F. Weeks $1,000 an acre for the property in an undeveloped state. In 1927 the American Refining Company, a Wichita Falls institution, in which some six or seven of the wealthiest men in Wichita Falls were interested, became insolvent. This company and those interested in it owed up in the millions of dollars and held considerable property. Its failure was a severe blow to the business interests of Wichita Falls. In 1929 there occurred the crash in the stock market and the general business depression. By 1928 petitioner had advanced some $15.000 to the Realty Company. Of this amount $11,000 was advanced in 1927 and $4,000 in 1928; petitioner was repaid $300 in 1928 and $2,000 in 1929. The $12,700 balance was charged off as a bad debt in petitioner's 1932 individual income tax return. No deduction was claimed in such returns with respect to the capital stock in the Realty Company. At *88 the time the Realty Company was formed W. F. Weeks had the active management of its affairs and continued to do so until he went to East Texas in 1931. Prior thereto he had been possessed of considerable estate, but by 1931 he had become heavily involved and in 1932 went into bankruptcy which resulted in the loss of all of his holdings, including his stock in the Realty Company. Thereafter petitioner had the active supervision and complete control of the Realty Company. In 1932 and for some time prior thereto no effort had been made to push the property held by the Realty Company because there was no market for lots. In 1934 there was a general improvement in the trend of real estate in Wichita Falls. In that year petitioner sold a five and a fraction-acre tract for a home site at $1,000 an acre. Later the purchaser wanted a little more land and purchased an acre and a fraction at the same rate. In 1938 and 1939 K N A Oil Field created considerable activity resulting in improvement in the real estate market. From 1932 to 1937 petitioner devoted the major portion of his time to the practice of law and gave practically no time at all to the affairs of the Park Place Realty Company. *89 In 1928 the Realty Company had borrowed $35,000 from the First National Company and had given a deed of trust upon all the land in the subdivision. The indebtedness became delinquent. It was renewed once or twice, payments were made on it, and from time to time the question would come up about refinancing it. Petitioner had not signed the papers and was not personally liable on the obligation. In every year from 1932 to 1937 the question of refinancing the indebtedness and getting it in shape more satisfactory to the holders of the indebtedness, or having petitioner get behind it or put some money into it came up and was considered. As of September 15, 1934, the date of the last renewal, the Realty Company had forfeited its charter by failure to pay its franchise tax to the state of Texas. The First National Company required that petitioner and one Mamie Morse, as composing a majority of directors of the corporation at the time of the forfeiture of its franchise, to ratify and confirm the extension agreement as trustees of the property of the dissolved corporation. For the capital stock tax year ended June 30, 1933, petitioner caused Federal capital stock tax returns to be filed *90 for the Realty Company for 1933, 1934, and 1935, in which the declared value for the capital stock was $20,000, $50,000, and $50,000, respectively. The tax due on these returns was paid by petitioner. The ad valorem taxes on the 200-acre tract owned by the Realty Company were delinquent from 1929 through 1937. The corporation's state franchise tax was delinquent in 1930 and was not paid thereafter. It forfeited its right to do business on August 2, 1930. The Secretary of State of Texas, on April 22, 1939, advised petitioner that the corporation could at any time revive its right to do business by paying all tax delinquencies, penalties, and a revival fee as provided by the state statute. The corporation had no material assets aside from those covered by the deed of trust. The stock in the Park Place Realty Company became worthless in a year prior to the taxable years in question. Opinion The amount paid by petitioner for his interest in the intangible assets of a law partnership may have been a capital investment, , which could not be compensated for by annual offsets against partnership *91 earnings, , nor by deductions for exhaustion of good will, which, by virtue of its uncertain life, has been treated as a nondepreciable asset. ; . But the proof of its loss was still necessary before petitioner would have been entitled to a deduction for the amount so paid. Respondent contends that the withdrawal of one of the partners in a prior year occasioned a technical termination of the earlier firm and the creation in its place of a successor. It may be that the basis of the continuing partners need not have been changed by that event. See . But the same theory would then prohibit the fixing of the instant years as the occasion for determination of gain or loss, since petitioner continued to participate in a law practice beyond the dissolution and liquidation of the second partnership and beyond the years in issue, and, for all that this record shows, *92 may still be enjoying the benefits of the original good will. We do not regard the facts shown as sufficient to demonstrate that petitioner has suffered any loss. Petitioner, who was then the operating head of a corporation of which he was both creditor and stockholder, took a deduction in a year long prior to the one before us, as a debt ascertained to be worthless, on account of the obligation owing to him by the corporation. He now seeks to deduct as a loss the amount of his investment in the stock. We think this attempt must be unsuccessful. It is elementary that in the distribution of corporate assets creditors are preferred over shareholders. Not only does petitioner, an attorney with wide experience in tax matters, recognize this principle but he concedes his knowledge of it. "I am perfectly willing to admit my debt came ahead of the stockholders * * *. I know it, and I would hate to admit I did not know it." When therefore he "ascertained" the corporate debt to be totally worthless, because nothing was recoverable by the creditors, it must have been even more certain that nothing would be available for the stockholders; in other words, that the stock was then at least as *93 much of a loss as was the debt. It would have been inconsistent to assume as in , that at that time "the stockholders had every reasonable prospect of a restoration of its financial structure and the recovery of the full value of their investments." Petitioner was in the best position to know the conditions at that time, and if he regarded the corporation's obligations as a hopeless prospect, it cannot be assumed that anyone would attach value to the corporation's shares. As in : "If the stock became worthless prior to the taxable year, then it could not be said that the loss was sustained during that year. Petitioner himself established that the stock became worthless prior to 1934 by selling in 1933, 500 shares at four-fifths of a cent a share." And see . Petitioner's conduct in ascertaining on that earlier occasion that the corporation was a worthless risk, a process which is incompatible with the continued existence *94 of value - see , - seems to us to make it impossible on this record for petitioner to be held to have sustained his burden of showing that the loss was sustained in the subsequent year. (November 18, 1942). It may be added that the fact that the corporation retained legal title to real property or that it continued to operate a business is not an insuperable barrier to the propriety of the prior deduction and any evidentiary force which these circumstances might otherwise provide is more than overcome by the consideration to which we have already referred. "Continued operation of a corporation does not in itself demonstrate that the stock had worth." , affirmed (C.C.A., 8th Cir.), . "'The fact that the shell of a worthless corporation continues in business is no bar to the deduction of an investment in that corporation's stock when all facts clearly indicate the stock to be worthless.'" *95 . And in , the Board held that an individual who retained title to real property the value of which had fallen below the liens against it, could deduct her investment as a loss upon showing that its value had become extinct. We think the situation must be even stronger where the property in question is the stock of a corporation which in turn holds title to the real estate. Since "the owner of stock who can show that it has become worthless may take a deduction for loss even though * * * there may be some slight or remote possibility that an indeterminate future may restore a value to them." , we see no impediment to the deduction for this loss in the earlier year and it follows that it should have been taken then if at all. Decisions will be entered under Rule 50.